# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# MONROE DIVISION

| | | |
|---|---|---|
| **SHELDRICK DEJOHNETTE** | * | **CIVIL ACTION NO.  15-0505** |
| **VERSUS** | * | **JUDGE ROBERT G. JAMES** |
| **CAROLYN W. COLVIN, ACTING COMMISSIONER, SOCIAL SECURITY ADMINISTRATION** | * | **MAG. JUDGE KAREN L. HAYES** |

## REPORT AND RECOMMENDATION

Before the court is plaintiff's petition for review of the Commissioner's denial of social security disability benefits.  The district court referred the matter to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).  For the reasons assigned below, it is recommended that the decision of the Commissioner be **AFFIRMED**, and this matter **DISMISSED** with prejudice**.**

## Background & Procedural History

Sheldrick DeJohnette protectively filed the instant application for Title II Disability Insurance Benefits on July 5, 2012.  (Tr. 145-151, 174).[1]  He alleged disability as of April 5, 2011, because of schizophrenia psychosis, post-traumatic stress disorder, major depression, high blood pressure, migraines, anxiety/panic attacks, and insomnia.  (Tr. 166).  The state agency denied the claims at the initial stage of the administrative process.  (Tr. 81-99).  Thereafter, DeJohnette requested and received a February 21, 2013,  hearing before an Administrative Law

---

[1]  DeJohnette filed a prior disability application on April 21, 2010, which was denied by an Administrative Law Judge on March 21, 2011.  *See* Tr. 66, 174, 77.  DeJohnette sought Appeals Council review, but that request was denied on June 15, 2012.  *See* Tr. 82.

Judge ("ALJ").  (Tr. 30-65).  However, in a June 28, 2013, written decision, the ALJ determined

that DeJohnette was not disabled under the Act, finding at step four of the sequential evaluation

process that he was able to return to his past relevant work as a paper mill laborer.  (Tr. 11-25).

DeJohnette appealed the adverse decision to the Appeals Council.  On September 26,

2013, however, the Appeals Council denied his request for review; thus, the ALJ's decision

became the final decision of the Commissioner.  (Tr. 3-5).  Over 16 months later, on February 3,

2015, the Appeals Council granted DeJohnette a 30 day extension of time from the date of its

February 3 notice in which to petition the court for judicial review of the Commissioner's final

decision.  (Tr. 1-2).

On March 4, 2015,  DeJohnette filed the instant complaint for judicial review.  Succinctly

re-characterized, he alleges the following errors,

1)      for various reasons, the ALJ's residual functional capacity assessment regarding
        the effects of plaintiff's mental impairments is not supported by substantial
        evidence; and

2)      the ALJ' step four determination is tainted because the ALJ's hypothetical to the
        vocational expert did not include all of plaintiff's limitations of functioning.

## **Standard of Review**

This court's standard of review is (1) whether substantial evidence of record supports the

ALJ's determination, and (2) whether the decision comports with relevant legal standards.  *Villa*

*v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990).  Where the Commissioner's decision is

supported by substantial evidence, the findings therein are conclusive and must be affirmed.

*Richardson v. Perales*, 402 U.S. 389, 390 (1971).  The Commissioner's decision is not supported

by substantial evidence when the decision is reached by applying improper legal standards.

*Singletary v. Bowen*, 798 F.2d 818 (5th Cir. 1986).  Substantial evidence is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v.*

*Perales*, 402 U.S. at 401.  Substantial evidence lies somewhere between a scintilla and a preponderance.  *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991).  A finding of no substantial evidence is proper when no credible medical findings or evidence support the ALJ's determination.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).  The reviewing court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citation omitted).

## **Determination of Disability**

Pursuant to the Social Security Act ("SSA"), individuals who contribute to the program throughout their lives are entitled to payment of insurance benefits if they suffer from a physical or mental disability.  *See* 42 U.S.C. § 423(a)(1)(D).  The SSA defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Based on a claimant's age, education, and work experience, the SSA utilizes a broad definition of substantial gainful employment that is not restricted by a claimant's previous form of work or the availability of other acceptable forms of work.  *See* 42 U.S.C. § 423(d)(2)(A).  Furthermore, a disability may be based on the combined effect of multiple impairments which, if considered individually, would not be of the requisite severity under the SSA.  *See* 20 C.F.R. § 404.1520(a)(4)(ii).

The Commissioner of the Social Security Administration has established a five-step sequential evaluation process that the agency uses to determine whether a claimant is disabled under the SSA.  *See* 20 C.F.R. §§ 404.1520, 416.920.  The steps are as follows,

(1)     An individual who is performing substantial gainful activity will not be found disabled regardless of medical findings.

3

(2)     An individual who does not have a "severe impairment" of the requisite
        duration will not be found disabled.

(3)      An individual whose impairment(s) meets or equals a listed impairment in
        [20 C.F.R. pt. 404, subpt. P, app. 1] will be considered disabled without
        the consideration of vocational factors.

(4)     If an individual's residual functional capacity is such that he or she can
        still perform past relevant work, then a finding of "not disabled" will be
        made.

(5)     If an individual is unable to perform past relevant work, then other factors
        including age, education, past work experience, and residual functional
        capacity must be considered to determine whether the individual can make
        an adjustment to other work in the economy.

*See Boyd v. Apfel*, 239 F.3d 698, 704 -705 (5th Cir. 2001);  20 C.F.R. § 404.1520.

The claimant bears the burden of proving a disability under the first four steps of the analysis;

under the fifth step, however, the Commissioner must show that the claimant is capable of

performing work in the national economy and is therefore not disabled.  *Bowen v. Yuckert*, 482

U.S. 137, 146 n. 5 (1987).  When a finding of "disabled" or "not disabled" may be made at any

step, the process is terminated.  *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir. 1990).  If at any

point during the five-step review the claimant is found to be disabled or not disabled, that finding

is conclusive and terminates the analysis.  *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### **The ALJ's Findings**

**I.     Steps One, Two, and Three**

        The ALJ determined at step one of the sequential evaluation process that DeJohnette did

not engage in substantial gainful activity during the relevant period.  (Tr. 16).  At step two, she

found that DeJohnette suffers severe impairments of major depressive disorder with psychosis

4

and post-traumatic stress disorder.  *Id*.[2]  She concluded, however, that the impairments were not severe enough to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4, at step three of the process.  (Tr. 17-19).

## II.   Residual Functional Capacity

The ALJ next determined that DeJohnette retained the residual functional capacity ("RFC") to perform work at all exertional levels, reduced by the following non-exertional limitations:  limited to simple, routine, repetitive tasks; inability to perform at a production rate pace, but able to perform goal-oriented work and simple work-related decisions; only occasionally interact with coworkers and the public; and non-confrontational interaction and supervision from supervisors.  (Tr. 19-24).

## III.   Step Four

At step four, the ALJ employed a vocational expert to find that DeJohnette was able to return to his past relevant work as a paper mill laborer, Dictionary of Occupational Titles ("DOT") Code 869-687-026, both as he actually performed the job, and as it is generally performed in the national economy.  (Tr. 24-25).[3]

<u>Analysis</u>

## I.   Residual Functional Capacity

a)   <u>Chronology of Relevant Medical Evidence and Testimony</u>

Plaintiff does not challenge the ALJ's resolution of the effects of his physical

---

[2]  The ALJ found that alleged impairments of high blood pressure/hypertension, migraines, daily tremors, obesity, and back pain were not severe.  *Id*.

[3]  Past relevant work is defined as "the actual demands of past work or 'the functional demands . . . of the occupation as generally required by employers throughout the national economy.'"  *Jones v. Bowen*, 829 F.2d 524, 527 (5th Cir. 1987) (citing, Social Security Ruling 82-61).

impairments.  Accordingly, the ensuing, non-exhaustive chronology focuses upon DeJohnette's mental impairments.

DeJohnette treated with E. H. Baker, Ph.D., from February 2010 until July 2011.  (Tr. 257).  Dr. Baker's treatment notes from January 19, 2011, document that DeJohnette had been working at a tire place in Bastrop part time, and then obtained a job with Graphic Packaging that lasted about one week.  (Tr. 224).  However, he could not handle the physical aspect of the work.  *Id*.  Accordingly, for the past two weeks, he had been working at Georgia Pacific.  *Id*.  He wanted Dr. Baker to write him a letter saying that he could not work, so he could send it to the credit union.  *Id*.  Dr. Baker remarked that he was not sure that this was possible.  *Id*.  He noted that DeJohnette's Rorschach was consistent with bipolar depression, with psychosis.  *Id*.

DeJohnette returned to Dr. Baker on April 6, 2011.  *Id*.  He continued to work at Georgia Pacific, but was at the end of his rope.  *Id*.  He had been moving from position to position.  *Id*.  He was extremely depressed.  *Id*.  He wanted Baker to write him a letter excusing him from work.  *Id*.  DeJohnette disclosed that he had been molested by his uncle when he was seven years old.  *Id*.  This revelation confirmed for Dr. Baker that DeJohnette had been living with subclinical post-traumatic stress disorder ("PTSD") his whole life.  *Id*.

DeJohnette returned to Dr. Baker on April 20, 2011.  (Tr. 224-225).  He still was having problems with depression, but his anxiety was down quite a bit.  *Id*.  He was unable to articulate why he was unable to focus on his job.  *Id*.

DeJohnette's next session with Dr. Baker was on May 10, 2011.  (Tr. 225).  He still was feeling depressed and having sleep problems.  *Id*.  He could sleep for only three hours at a time.  *Id*.  He reported nightly nightmares of his uncle molesting him.  *Id*.  He worried that his wife would divorce him if his condition did not improve.  *Id*.

6

Dr. Baker's notes from May 24, 2011, reflect that DeJohnette continued to be very depressed, with frequent crying spells.  (Tr. 225).  He felt hopeless.  *Id*.  He experienced auditory hallucinations.  *Id*.

DeJohnette returned to Dr. Baker on June 7, 2011.  (Tr. 225).  The discussion focused on the importance of a good sleep schedule.  *Id*.  He was instructed not to take long naps during the day.  *Id*.  He was very distressed, but seemed to be working on his problems – slowly.  *Id*.

DeJohnette returned to Dr. Baker on June 22, 2011.  (Tr. 225-226).  He continued to be depressed and confused.  *Id*.  He had accomplished a minimal amount of activities from the last session.  *Id*.  His sleep was very poor; he stayed awake most nights and slept during the day.  *Id*.  DeJohnette no longer had insurance and could not continue to pay for treatment and medication.  *Id*.  Accordingly, Baker resolved to refer him to Bastrop Mental Health.  *Id*.

In his July 5, 2011, letter of referral to Bastrop Mental Health, Dr. Baker noted, *inter alia*, that DeJohnette had discontinued some of his medication, likely because of his failure to follow instructions.  (Tr. 257).  He tended to be non-compliant with medication administration.  *Id*.

DeJohnette attended individual counseling at Bastrop Mental Health beginning in July 2011.  Treatment notes from July 27, 2011, document that DeJohnette was out of medication because he had no insurance to pay expenses.  (Tr. 249-251).  He explained that he had attempted to run into the back of a truck within the past year.  *Id*.  He and his wife separated about four months earlier.  *Id*.

On September 1, 2011, DeJohnette underwent a psychiatric evaluation at Bastrop Mental Health – apparently with Rita Agarwal, M.D.  (Tr. 252-256).  At that time, he was not sleeping, and stressed out.  *Id*.  He was abusive to his wife.  *Id*.  He reported that he had been sexually

7

harassed by a co-worker.  *Id*.  His appetite was good, but energy, interests and concentration were low.  *Id*.  Mental status examination revealed that he sometimes heard voices.  *Id*.  He had flat affect, was alert, and oriented x3, with fair insight, judgment and impulse control.  *Id*.  He had good eye contact and low average intelligence.  *Id*.  Agarwal diagnosed major depressive disorder with psychosis, recurrent.  *Id*.  She assigned a Global Assessment of Functioning ("GAF") score of 50.  *Id*.[4]

A mental health assessment from September 15, 2011, documented that DeJohnette needed individual therapy and medication management to decrease intensity of depressive symptoms, with referral to a support group.  (Tr. 234).

DeJohnette was admitted to the psychiatric unit at E. A. Conway Hospital from October 11-25, 2011.  (Tr. 241-243).  His discharge diagnoses included major depressive disorder, severe, recurrent with psychotic features.  *Id*.  At discharge, he had a GAF of 50.  *Id*.  Upon admission neuro-vegetative signs were positive, with decreased sleep, decreased appetite, weight loss, poor concentration, helplessness, hopelessness, auditory hallucinations of mother telling him to come home.  *Id*.  He had one prior suicide attempt by trying to drown himself in the bathtub.  *Id*.  Upon admission, he was positive for delusions; his memory was intact; attention and concentration were appropriate, insight and judgment were poor; sleep was poor.  *Id*.  He also was positive for auditory hallucinations and suicidal ideation.  *Id*.  Over the course of his

---

[4]   "GAF is a standard measurement of an individual's overall functioning level 'with respect only to psychological, social, and occupational functioning.'"  *Boyd*, 239 F.3d at 701 n.2 (citing AMERICAN PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 32 (4th ed. 1994) (DSM-IV)).

A GAF of 41-50 denotes "**[s]erious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting ) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job)."  DSM-IV, pg. 32.

stay, his symptoms decreased. *Id*. Upon discharge, his memory was intact, attention and concentration were fair, judgment suspect, insight was superficial, and both sleep and appetite were good. *Id*.

During an April 18, 2012, mental counseling session, DeJohnette appeared alert and oriented x 3. (Tr. 263). He had good eye contact and interaction. *Id*. However, he continued to hear voices and experienced suicidal ideation. *Id*. His family was close and supportive. *Id*. He enjoyed playing with his grandchildren. *Id*. His sisters were paying his bills. *Id*.

A progress note from a May 30, 2012, therapy session indicates that DeJohnette was alert and cooperative. (Tr. 264). He picked up his medication. *Id*. He had good sleep/appetite, and denied current audio/visual hallucinations. *Id*.

On June 13, 2012, DeJohnette appeared alert and oriented x 3. (Tr. 265). He had good eye contact and interaction. *Id*. However, he had to depend on others to take care of his needs. *Id*.

On July 12, 2012, DeJohnette's daughter, Coedeisha Archie, completed an SSA function report stating that DeJohnette was able to perform household repairs, iron, mow, and clean out trash can. (Tr. 187). However, he needed encouragement to stay on task. *Id*. Moreover, he did not do yard work because the medicine made him drowsy; thus, he was not safe riding mowers and using weed-eaters. (Tr. 188). Nonetheless, he could drive a car and goes out alone. (Tr. 188). However, he did not go out and socialize like he did in the past. (Tr. 189).

A July 12, 2012, progress note reflects that DeJohnette was alert and oriented x3. (Tr. 266). He received Easter Seals case management services weekly. *Id*. He was taking his medication, as prescribed. *Id*. His sleep was fair. *Id*. Increased depressive symptoms were noted, however. *Id*. He continued to attend group activities weekly, and remained active. *Id*.

9

He felt that medication was helping to control his depression. *Id*.

DeJohnette returned for a counseling session on August 23, 2012. (Tr. 285). He reported some sadness stemming from his separation, but maintained a good relationship with his wife. *Id*. He denied any problems or side effects from his medication regimen. *Id*. He also denied any thoughts of violence or wanting to hurt others. *Id*.

At the request of the state agency, DeJohnette underwent a mental status examination with clinical psychologist, Jon Haag, Psy.D., on August 29, 2012. (Tr. 269-271). DeJohnette stated that poor concentration and focus prevented him from working. *Id*. He also appeared to have impairments in social functioning. *Id*. He felt uncomfortable in stores and around people. *Id*. Activities of daily living were impacted. *Id*. He was able to care for his own physical needs, including bathing self, dressing self, and driving. *Id*. He experienced hallucinations about two to three times per week. *Id*. He also reported nightmares of sexual abuse two to three times per week. *Id*. He noted low energy and poor concentration. *Id*. He was dressed appropriately with adequate attention to hygiene and grooming. *Id*. Eye contact was appropriate. *Id*. At times, however, he would stare at the wall with a blank expression on his face. *Id*. He appeared depressed, as evidenced by his flat affect. *Id*. His two to three times per week auditory hallucinations told him to kill himself. *Id*. His memory and concentration were impaired, but he did not appear anxious. *Id*. Intellectual functioning was expected to be low average. *Id*.

Haag diagnosed post-traumatic stress disorder and psychotic disorder, NOS. *Id*. He assigned a GAF of 50. *Id*. He opined that DeJohnette had moderate memory and concentration impairments. *Id*. Furthermore, he appeared able to understand and follow simple instructions, but incapable of handling funds awarded to him. *Id*. Prognosis was guarded. *Id*.

On September 6, 2012, DeJohnette returned for more counseling. (Tr. 286). He was

doing well and things were going well with his family.  *Id*.  He felt confident that he would

reconcile with his wife.  *Id*.  He had had a pleasant time with his siblings over the weekend.  *Id*.

On September 24, 2012, non-examining agency psychologist, Cathy Word, Ph.D.,

reviewed the available record, including Dr. Haag's consultative examination, but opined that

DeJohnette's mental impairment were less than marked.  (Tr. 277, 87-91).  She also signed off

on a psychiatric review technique and mental residual functional capacity form to that effect.

(Tr. 277, 87-91).

On October 4, 2012, DeJohnette returned for counseling.  (Tr. 287).  He reported some

sadness and anxiety because he had been denied disability and had no income.  *Id*.  He denied

suicidal ideation and stated that he needed to be there for his family.  *Id*.  He was counseled to

stay positive.  *Id*.

A behavioral health assessment dated October 4, 2012, noted that DeJohnette was

friendly, able to make friends, and sociable.  (Tr. 364).

On October 9, 2012, DeJohnette saw Dr. Agarwal.  (Tr. 297).  She noted that DeJohnette

lived with his brother.  *Id*.  DeJohnette reported that he was depressed, unable to focus, and

heard voices.  *Id*.  He had started to do yard work for someone, but was unable to finish.  *Id*.  He

had a flat, depressed mood.  *Id*.

On October 15, 2012, DeJohnette returned for another individual therapy session.  (Tr.

288).  He reported ongoing depression and trouble sleeping, with intermittent auditory

hallucinations.  *Id*.  He could not get past his uncle's sexual abuse and was crying more each

day.  *Id*.  The therapist noted that he was unable to retain a job at that point.  *Id*.

On October 18, 2012, Dr. Agarwal noted that DeJohnette had gone to his estranged

wife's house, and did not want to leave, becoming aggressive.  (Tr. 298).  Voices had told him to

kill his wife. *Id*. He had not been sleeping. *Id*. He was compliant with his medication. *Id*. He was ready to go to work, but had not worked for two years. *Id*. She noted that he was not safe – depressed, with flat affect, and suicidal thought. *Id*. Accordingly, Dr. Agarwal admitted him to E. A. Conway. *Id*.

DeJohnette was hospitalized from October 18-25, 2012. (Tr. 302-304). His discharge diagnosis was major depressive disorder, recurrent with psychosis, and a GAF of 50. *Id*. He had lain down in the street so a car could run him over. *Id*. He felt helpless, hopeless, and guilty. *Id*. He was sleeping only two to three hours per day, and gained 15 pounds in the past four months. *Id*. He had heard command hallucinations to kill himself. *Id*.

On October 30, 2012, DeJohnette returned for individual psychotherapy. (Tr. 289). He admitted that he had not been taking his medications, as ordered. *Id*. Rather, he had forgotten to take them for a few days. *Id*. He continued to have difficulty sleeping at night, and took naps during the day. *Id*. He also heard voices at times while watching television. *Id*.

On November 1, 2012, Raj Bhandari, M.D. noted that DeJohnette had normal judgment and affect, oriented x 3, with normal memory. (Tr. 342).

DeJohnette returned for an individual psychotherapy session on November 8, 2012. (Tr. 290). He reported that he was sleeping better, and denied suicidal ideation and audio/visual hallucinations. *Id*. He also denied problems with his medication. *Id*.

On November 20, 2012, DeJohnette reported hearing intermittent voices, but could not understand them. (Tr. 291).

On December 11, 2012, Dr. Agarwal noted that DeJohnette was calm, cooperative, neat, and clean, but did not shower every day. (Tr. 301). She documented DeJohnette's need for a personal care attendant to help monitor medication and watch over him for probably three to four

hours per week.  (Tr. 301).  Agarwal indicated on the form that DeJohnette suffered from schizoaffective disorder; post-traumatic stress disorder; victim of sexual abuse; and major depression with psychosis.  (Tr. 278-279).  She checked a box indicating that he was at risk for deterioration "in mental or physical condition of functioning if either home and community-based services or nursing facility services are not provided in less than 120 days."  *Id*.  The form had a space for a brief statement to support the response, but Agarwal left it blank.  *Id*.

On December 11, 2012, DeJohnette returned for another counseling session.  (Tr. 292).  He reported increased anxiety, and bad dreams that tend to wake him at night.  *Id*.  He watched television during the day and sometimes played dominoes with his uncle.  *Id*.

On December 19, 2012, DeJohnette reported that he sometimes became sad because he had no money.  (Tr. 293).  However, he had a supportive family, and felt good about his chances of drawing disability.  *Id*.  He was alert and oriented, and pleasant, as always.  *Id*.

DeJohnette returned for a session on January 3, 2013.  (Tr. 295).  He was neatly dressed, with good hygiene.  *Id*.  He had been experiencing a lot of bad dreams lately.  *Id*.  Voices were telling him to discuss his issues with his deceased mother.  *Id*.

At the February 21, 2013, hearing DeJohnette testified that he had three children, Coedeisha Archie, 25; Cordeila Bryant, 23; and Rosa Bryant, 19.  (Tr. 36-37).  Although DeJohnette acknowledged that he had a driver's license, his daughter wanted him to drive as little as possible.  *Id*.  In addition, he had not received unemployment or workers' compensation since 2011.  (Tr. 38-39).

DeJohnette stated that he stopped working because he started hearing voices, and Dr. Baker took him off of work.  (Tr. 38).  DeJohnette explained that he was unable to work because his mind would not let him stay focused  – he hears voices, becomes confused, and is unable to

13

concentrate.  (Tr. 39).  His medication sometimes relieves his symptoms, but it tires him and makes him zombie-like at some stages.  (Tr. 43).  He has trouble staying focused, concentrating and paying attention.  (Tr. 44-45).  It also is difficult for him to follow information and instructions.  (Tr. 45).  He remains isolated in his house, in his room.  *Id*.

Nonetheless, DeJohnette admitted that his uncle and a friend come over and play dominoes about three to four times per week for two to three hours at a time.  (Tr. 47). He continues to have low energy and trouble sleeping at night.  (Tr. 50).  Thus, he sleeps during the day a lot.  (Tr. 52). He hears voices daily.  (Tr. 51).

DeJohnette's daugher, Coedeisha Archie testified that taking care of DeJohnette is like raising a child.  (Tr. 56).  She has to take off of work to go to doctor's appointments and has to have him committed when he talks about killing himself or hurting others.  (Tr. 56).  She brings him something to eat in the mornings and afternoons.  (Tr. 57).  She does not let her children ride in a vehicle with him.  (Tr. 57).  He could not maintain a household without her.  (Tr. 57).

A March 7, 2013, visit to the Mer Rouge Rural Health Clinic revealed no problems psychiatrically.  (Tr. 380).  DeJohnette denied anxiety, hyperactivity, withdrawn behavior.  *Id*. Upon examination, his mood and affect were appropriate.  *Id*.

On April 1, 2013, DeJohnette reported that his psychiatric state was normal, with no problems.  (Tr. 383).

b)      Discussion

The ALJ reviewed the available evidence, including the hearing testimony, the medical treatment history, and the findings of the treating, consultative, and agency physicians/psychologists.  (Tr. 19-25).  In deriving plaintiff's RFC, the ALJ assigned great weight to the opinion of the non-examining agency psychologist, Cathy Word – essentially

14

adopting Dr. Word's function-by-function assessment of the effects of plaintiff's mental impairments.  *Id*.  Plaintiff contends that the ALJ erred in so doing, because her decisions to assign little weight to the opinion of the treating psychiatrist, Rita Agarwal, M.D., and limited weight to the findings of the consultative psychologist, Jon Haag, Psy.D., are not well supported. The court appreciates plaintiff's arguments, but remains unpersuaded that the ALJ committed reversible error, or that her RFC otherwise is not supported by substantial evidence.

Ordinarily, a treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence . . ."  20 C.F.R. § 404.1527(c)(2).  However, "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion."  *Martinez v. Chater*, 64 F.3d 172, 175-76 (5th Cir.1995) (citation omitted).  Nonetheless, an ALJ cannot reject a medical opinion without an explanation supported by good cause.  *See Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir.2000) (citations omitted).  When the Commissioner declines to accord controlling weight to the treating physician's opinion, then she will consider several factors in determining the weight to be given the opinion.  20 C.F.R. 404.1527(c)(2).  *Id*.  One of those considerations is supportability, i.e., "[t]he more a medical source presents relevant evidence to support an opinion, *particularly medical signs and laboratory findings*,[5] the more weight [the Commissioner] will give that opinion."  20 C.F.R. 404.1527(c)(2)(ii) (emphasis added).[6]

---

[5]  Laboratory findings are defined elsewhere in the regulations to include such items as blood pressure readings and x-rays.  20 C.F.R. § 404.1513.

[6]  The ALJ, however, need not perform a detailed analysis of § 404.1527(c) factors where, as here, the record contains reliable medical evidence from another examining physician. *See Holifield v. Astrue*, 402 Fed. Appx. 24 (5th Cir. Nov. 10, 2010) (unpubl.) (citation omitted); *see also Bullock v. Astrue*, 2007 WL 4180549 (5th Cir. 11/27/2007) (unpubl.).

Here, Dr. Agarwal did not complete a medical source statement.  The portion of her treatment notes that potentially conflicts with Dr. Word's assessment is her indication that DeJohnette was at risk for deterioration "in mental or physical condition of functioning if either home and community-based services or nursing facility services are not provided in less than 120 days."  The ALJ appropriately noted, however, that Dr. Agarwal did not provide an explanation to support her response.  (Tr. 23).  Moreover, the ALJ observed that the supposed need for close support services was not supported by Dr. Agarwal's own treatment notes.  *Id*.  As it turns out, there is no indication that DeJohnette's level of functioning materially deteriorated when he did not receive the support services recommended by Dr. Agarwal.[7]

The lack of corroborative evidence in the treatment records is a valid reason for discounting a physician's opinion.  *See Ward v. Barnhart*, 192 Fed. Appx. 305, 308, 2006 WL 2167675 (5th Cir. 08/02/2006) (unpubl.); *see also Nugent v. Astrue*, 2008 WL 2073891 (5th Cir. May 16, 2008) (ALJ entitled to discount treating physician's conclusory statement because it contradicted earlier treatment notes, objective medical findings, and other examining physicians' opinions); *Richard ex rel. Z.N.F. v. Astrue*, 2012 WL 2299479 (5th Cir. June 15, 2012) (unpubl.) (ALJ may discredit physician's opinion by pointing to contrary evidence, albeit however tersely); *Garth v. Astrue*, 393 F. App'x 196, 199 (5th Cir. Aug. 26, 2010) (unpubl.) (court noted that ALJ *could have* discounted treating physician's opinion because the opinion contradicted his own treatment notes and the claimant's admissions); *Vansa v. Astrue*, 423 F. App'x 381, 383 (5th

---

[7] Indeed, in the absence of some evidence that DeJohnette's condition improved since 2012-2013 (which does not appear to be the case, because he apparently began receiving disability pursuant to a subsequent application, *see* IFP App., doc. # 2, pg. 2), it is difficult to reconcile DeJohnette's professed need for extensive care and supervision, with his later-acquired ability to adopt and provide for a five year old child, who possibly also was his own granddaughter.  *See* IFP Application, doc. # 2, pg. 2.

Cir. April 20, 2011) (unpubl.) (upholding ALJ's decision to discount treating physician's opinion because, as the ALJ explained, it was "not supported by the objective findings of his own clinic notes nor by the evidence as a whole.").

Plaintiff has not demonstrated that the remainder of Dr. Agarwal's findings or the examination findings of the consultative psychologist are inconsistent with the impressions of Dr. Word.  Although multiple psychiatrists and psychologists, including Drs. Agarwal and Haag assigned DeJohnette a GAF score of 50, it is manifest that the number is at the top of the "serious symptoms" range, and only just outside the range for "moderate" symptoms.  Moreover, a GAF score of 41-50 denotes serious symptoms such as *suicidal ideation OR* a serious impairment in social or occupational functioning.  *DSM IV*, pg. 32.  Here, of course, DeJohnette's GAF score potentially is justified by his suicidal ideation, rather than the psychiatrist/psychologist's impression that his impairments imposed serious limitations of functioning.[8]

Indeed, the foregoing interpretation is supported by Dr. Haag's own report.  Despite assigning a GAF score of 50, Haag opined that DeJohnette had but *moderate* memory and concentration impairments.  He added that DeJohnette appeared able to understand and follow simple instructions.  In sum, it is clear that Dr. Word's assessment of plaintiff's mental impairments is premised upon Dr. Haag's compatible examination findings.

Plaintiff argues, however, that Dr. Word did not have the benefit of over 100 pages of

---

[8]  As he is want to do, plaintiff's counsel endeavored to have Dr. Agarwal complete a medical source statement.  (Tr. 34-35).  By that time, however, she had left the employ of Bastrop Mental Health.  *Id*.  Accordingly, counsel told the ALJ that plaintiff was expected to see the new psychiatrist, Dr. Braswell, on March 1, 2013, and that counsel intended to obtain a medical source statement from him.  (Tr. 35).  For whatever reason, counsel did not supplement the record with Dr. Braswell's impressions.

subsequent medical evidence, which had she viewed, might have propelled her to find that

DeJohnette's mental impairment(s) met or equaled Listing 12.06C – given his apparent need for

supervision and "complete inability to function outside the area of ones' home." Consequently,

plaintiff argues that the ALJ was obliged to obtain an updated medical opinion. (Pl. Brief, pg.

10).

    The court notes that an updated opinion from a medical expert is required:

    *     When no additional medical evidence is received, but in the
         opinion of the administrative law judge or the Appeals Council the
         symptoms, signs, and laboratory findings reported in the case
         record suggest that a judgment of equivalence may be reasonable;
         or

    *     When additional medical evidence is received that in the opinion
         of the administrative law judge or the Appeals Council may
         change the State agency medical or psychological consultant's
         finding that the impairment(s) is not equivalent in severity to any
         impairment in the Listing of Impairments.

POLICY INTERPRETATION RULING TITLES II AND XVI: CONSIDERATION OF ADMINISTRATIVE
FINDINGS OF FACT BY STATE AGENCY MEDICAL AND PSYCHOLOGICAL CONSULTANTS AND
OTHER PROGRAM PHYSICIANS AND PSYCHOLOGISTS AT THE ADMINISTRATIVE LAW JUDGE AND
APPEALS COUNCIL LEVELS OF ADMINISTRATIVE REVIEW; MEDICAL EQUIVALENCE, SSR-96-6p
(July 2, 1996).

However, there is no indication that either the ALJ or the Appeals Council were of the opinion

that an updated medical expert opinion was required. Furthermore, although plaintiff's counsel

argued at the hearing that his client met or equaled a listing, he did not urge the ALJ to obtain an

updated medical opinion.[9]

    In addition, the introductory regulations for Mental Disorders explains that "[t]he

paragraph C criterion of 12.06 reflects the uniqueness of agoraphobia, an anxiety disorder

manifested by an overwhelming fear of leaving the home." 20 C.F.R. § Pt. 404, Subpt. P, App.

---

    [9] Albeit, at that time, plaintiff's counsel still intended to obtain a medical source
statement from plaintiff's new treating psychiatrist.

1, Section 12.00F.  The instant record contains substantial evidence that DeJohnette did *not* have

an overwhelming fear of leaving his home.  At minimum, he regularly left his home to attend

counseling and mental health sessions.

In lieu of an updated medical opinion, the ALJ aptly noted that at least one of plaintiff's

episodes of decompensation was attributable to a period when he had forgotten to take his

medication for several days prior to admission.  Moreover, upon discharge following his first

admission, plaintiff's memory was intact, with fair attention and concentration.  The ALJ also

noted that despite plaintiff's allegations of isolation, he admitted that he visited with family and

friends, played dominoes several times per week for two to three hours at a time, and attended

group counseling sessions.  In fact, a behavioral health assessment dated October 4, 2012,

observed that DeJohnette was friendly, sociable, and able to befriend others.  (Tr. 364).

Physician's visits for other ailments in March and April 2013, documented no psychiatric

problems.  (Tr. 380-383).  In addition, although plaintiff complained of inability to sleep at night,

sleep studies in April 2013 demonstrated that he was able to sleep for six hours per session.  (Tr.

396-402).

Plaintiff further contends that the ALJ erred by failing to incorporate Dr. Haag's finding

that he suffered moderate limitations in memory and concentration.  However, an RFC that

includes "restrictions to rare public interaction, low stress, and simple, one-to-two-step

instructions reflect that the ALJ reasonably incorporated [the claimant]'s moderate

concentration, persistence, and pace limitations . . ." *Bordelon v. Astrue*, 281 F. App'x 418, 423

(5th Cir. 2008) (unpubl.) (citation omitted).[10]  Citing *Bordelon*, other courts in this circuit have

---

[10]  Although an unpublished Fifth Circuit decision does not constitute precedent, the fact
that it is unpublished reflects the panel's opinion that the case addresses well-settled principles
of law.  *See* 5th Cir. Rule 47.5.1-5.

held that an RFC limited to simple work reasonably incorporates a moderate or even *marked* limitation in concentration, persistence, or pace.  *Reid v. Astrue*, Civil Action No. 10-0237, 2011 WL 4101302 (S.D. Miss. Aug. 15, 2011) *report and recommendation adopted,* 2011 WL 4101277 (S.D. Miss. Sept. 8, 2011); *Madrid v. Colvin*, Civil Action No. 12-800, 2013 WL 6641305 (N.D. Tex. Dec. 17, 2013); *Cornejo v. Colvin*, Civil Action No. 11-470, 2013 WL 2539710 (W.D. Tex. June 7, 2013).  Here, of course, plaintiff's past relevant work, plus the other jobs identified by the vocational expert all had an "SVP" of 2, which is considered unskilled work,[11] and thus, by definition, "work which needs little or no judgment to do *simple* duties that can be learned on the job in a short period of time."  (Social Security Ruling 83-10 (emphasis added)).

Plaintiff also faults the ALJ's credibility determination.  Here, the ALJ found that plaintiff's statements regarding the disabling effects of his impairments were not *fully* credible.  (Tr. 20, 23).  In other words, the ALJ found plaintiff credible, but only insofar as his statements and testimony did not conflict with the ALJ's RFC.

When assessing credibility, the ALJ is required to consider the objective medical evidence, the claimant's statements, the claimant's daily activities, and other relevant evidence. POLICY INTERPRETATION RULING TITLES II AND XVI: EVALUATION OF SYMPTOMS IN DISABILITY CLAIMS: ASSESSING THE CREDIBILITY OF AN INDIVIDUAL'S STATEMENTS, SSR 96-7P (S.S.A July 2, 1996).  The ALJ also must consider inconsistencies in the evidence and conflicts between the claimant's statements and the remainder of the evidence.  20 C.F.R. § 404.1529(c)(4).  However, the ALJ need not follow formalistic rules in her credibility assessment.  *Falco v. Shalala*,  27

---

[11]   *See* TITLES II AND XVI: USE OF VOCATIONAL EXPERT AND VOCATIONAL SPECIALIST EVIDENCE, AND OTHER RELIABLE OCCUPATIONAL INFORMATION IN DISABILITY DECISIONS (SSR-00-4p).

F.3d 160, 164 (5th Cir. 1994).

Here, the ALJ discussed the evidence, including plaintiff's allegations.  Plaintiff contends that the ALJ *should have* fully credited his self-described limitations, including his limited ability to care for himself.  According to Dr. Haag, however, DeJohnette was able to care for his own physical needs.  (Tr. 269).  Plaintiff maintains that the ALJ failed to note that he was unable to spend time with his grandchildren, without supervision.  However, plaintiff later adopted a five year old child, who possibly was his own grandchild.

Plaintiff also argues that the ALJ failed to mention his excellent 23 year work history.  Citing decisions from other circuits, plaintiff argues that his excellent work history buttresses his credibility.  However, there is no indication that the Fifth Circuit has adopted the foregoing principle.  In any event, the ALJ would have been well aware of plaintiff's work history.  (Tr. 62, 153).

In sum, the court finds that the ALJ's credibility determination satisfied the requirements of 20 C.F.R. § 404.1529, and is supported by substantial evidence.  *See Undheim v. Barnhart*, 214 Fed. Appx. 448 (5th Cir. Jan. 19, 2007) (unpubl.) (opinion as a whole gave sufficient reasons and documentation for the ALJ's credibility determination); *Cornett v. Astrue*, 261 Fed. Appx. 644 (5th Cir. Jan. 3, 2008) (unpubl.) (ALJ gave some weight to claimant's complaints; thus claimant's arguments that his subjective complaints were not given enough weight is unavailing);  *Hernandez v. Astrue*, 2008 WL 2037273 (5th Cir. May 13, 2008) (unpubl.) (despite claimant's subjective allegations of pain, the ALJ gave "greatest weight" to treating physician's opinion).

## II.    Step Four

Re-urging the same arguments employed to challenge the sufficiency of the ALJ's

residual functional capacity assessment, plaintiff contends that the ALJ's step four conclusion is flawed because her hypothetical to the vocational expert failed to include additional limitations of functioning.  However, a hypothetical need only reasonably incorporate the disabilities and limitations recognized by the ALJ.  *Bowling v. Shalala*, 36 F.3d 431 (5th Cir. 1994).  Here, the ALJ's hypothetical(s) to the vocational expert substantially incorporated the limitations recognized in her residual functional capacity assessment, and that assessment is supported by substantial evidence.  *See* discussion, *supra*.  Furthermore, an ALJ's hypothetical is not defective when, as in this case, the claimant is afforded an adequate opportunity to correct any real or asserted deficiencies in the ALJ's question.  *See Hardman v. Colvin*, No. 15-30449, ___ Fed. Appx. ___, (5th Cir. Apr. 11, 2016) (citations omitted).[12]

### Conclusion

The evidence in this case was by no means uniform and could have supported a different outcome.  Such conflicts in the evidence, however, are for the Commissioner to resolve.  *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990) (citation omitted); *Grant v. Richardson*, 445 F.2d 656 (5th Cir. 1971) (citation omitted).  This court may not "reweigh the evidence in the record, try the issues de novo, or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." *Newton, supra.*[13]  That is not to say that the Commissioner's decision is blemish-free, but procedural perfection in the administrative process

---

[12] "Procedural perfection in administrative proceedings is not required."  *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir.1988).

[13] Generally, courts "only may affirm an agency decision on the basis of the rationale it advanced below."  *January v. Astrue*, No. 10-30345, 2010 WL 4386754 (5th Cir. Nov. 5, 2010) (citation omitted).  One exception to this rule, however, is harmless error, i.e. absent the alleged error or omission, there is "no realistic possibility" that the ALJ would have reached a different result.  *Id*.  This exception is applicable here.

is not required, and any errors do not undermine confidence in the decision.  *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir.1988).[14]

For the foregoing reasons, the undersigned finds that the Commissioner's determination that the claimant was not disabled under the Social Security Act for the period at issue, is supported by substantial evidence and remains free of legal error.  Accordingly,

IT IS RECOMMENDED that the Commissioner's decision be AFFIRMED, in its entirety, and that this civil action be DISMISSED with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen  (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, this 12th day of April 2016.

---

[14]  Procedural improprieties "constitute a basis for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir.1988).

23

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE